IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.

DONALD R. LAFOND, JR.,

     Defendant.

CRIMINAL CASE NO.
1:13-CR-092-WSD-LTW

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Pending before this Court is Defendant Donald R. Lafond, Jr.'s ("Defendant") Motion to Suppress Statements.  Docket Entry [23].  On July 1, 2013, this Court convened a suppression hearing on Defendant's Motion to Suppress, Docket Entry [28], after which Defendant submitted a post-hearing brief in support of his motion, Docket Entry [30].  The Government filed a response in opposition to Defendant's motion on September 6, 2013.  Docket Entry [32].  Having considered Defendant's motion, the parties' briefs, and all supporting documents submitted, and for the reasons set forth below, this Court **RECOMMENDS** that Defendant's Motion to Suppress be **GRANTED IN PART AND DENIED IN PART**.  Docket Entry [23].

## BACKGROUND

On March 19, 2013, the Grand Jury entered a one-count indictment against

Defendant and Co-Defendant Jason Robert Widdison ("Widdison").  The indictment charged that Defendant and Co-Defendant Widdison, aided and abetted by each other, unlawfully killed Kenneth Mills ("Mills"), a fellow inmate, with malice aforethought in violation of 18 U.S.C. §§ 1111, 7(3), and 2.  (Indictment, Docket Entry [1]).

1.   **Defendant Makes Statements to Officer Smith Subsequent To Fight in Recreation Yard**

Defendant is incarcerated at the United States Penitentiary in Atlanta, Georgia ("U.S.P. Atlanta").  On March 1, 2011, a physical altercation took place between Defendant, Widdison and fellow inmate Mills while on the recreation yard in the Segregation Housing Unit ("SHU") of U.S.P. Atlanta.  (Transcript of July 1, 2013 hearing, ("Tr."), Docket Entry [29], 7).  As a result of injuries sustained from the altercation, Mills subsequently died.  (Tr. 16).

Officer Batayias Smith ("Officer Smith"), a correctional officer in the SHU, was notified of the fight between prisoners when he heard fellow correctional officer Xavier Johnson ("Officer Johnson") scream "fight" from the SHU recreational yard.  (Tr. 5-6). Officer Smith immediately responded to Officer Johnson's call and proceeded to the recreation yard to assist in cuffing the inmates that were fighting.  (Tr. 7).  Four to five officers came to the recreation yard in response to Officer Johnson's call; Officer Smith was the first to respond.  (Tr. 11).  After both Defendant and Widdison were cuffed, Officer Smith and another correctional officer escorted Defendant back upstairs to his cell.  (Tr. 8, 11).  While being escorted to his cell, Defendant remained cuffed, as was

2

normal procedure in the SHU whenever there was movement of an inmate out of his cell.  (Id.).

While escorting Defendant back to his cell, a process that took five to ten minutes, Officer Smith testified that he did not question or discuss anything with Defendant.  (Tr. 9).  Officer Smith recalls that Defendant did not say much while being escorted back to his cell.  (Tr. 10).  Though Officer Smith did not initiate any conversation with the Defendant, according to Officer Smith, Defendant spontaneously told Officer Smith in more than one statement that Defendant's intentions were to "fight or beat up the guy [Mills]."  (Tr. 10-11, 13).  Officer Smith also testified that Defendant never implied who committed the assault other than himself.  (Tr. 10).  According to Officer Smith, Defendant also stated that Mills "was talking trash and being disrespectful."  (Tr. 13).  No one threatened Defendant to speak with Officer Smith.  (Tr. 9).

## 2.   Special Agent Szabo Questions Defendant Regarding the Incident in the Recreation Yard as Part of His Investigation

On March 2, 2011, Special Agent Paul Szabo ("Agent Szabo") and Special Agent Chad Fitzgerald ("Agent Fitzgerald") who are employed with the Federal Bureau of Investigation (F.B.I.), went to U.S.P. Atlanta to investigate the fight between Defendant, Widdison and Mills.  (Tr. 16-17).  Agent Szabo was the case agent with primary investigatory duties for the matter once notified by Special Investigative Agent Gurson Rivera of the incident.  (Tr. 17).

Agent Szabo interviewed Defendant in an office measuring approximately twenty

3

feet by twenty feet within the SHU located next to Bureau of Prisons Lieutenant Prentice Jackson's (Lt. Jackson) office.  (Tr. 18).  Agent Szabo conducted the interview of Defendant while Agent Fitzgerald, Lt. Jackson, and Officer Smith were present.  (Tr. 18-19).  Agent Szabo was seated behind a desk in the office and Defendant was seated in front of the same desk.  (Tr. 19).  As was the policy in the SHU Unit, Defendant was in handcuffs for the entire interview since he was outside of his cell.  (Tr. 20).  Lt. Jackson and Agent Fitzgerald were also seated while Officer Smith stood against a wall in the office.  (Tr. 19).  Agent Szabo was not in possession of any weapons during his interview of Defendant.  (Tr. 20).

Prior to questioning Defendant, Agent Szabo advised Defendant of his <u>Miranda</u> rights by both reading word for word from the F.B.I. Advice of Rights Form and holding the same form to allow Defendant to read it as well.  (Tr. 20, 22; Ex. 1).  Both Agent Szabo and Agent Fitzgerald signed the Advice of Rights Form attesting to the fact that Defendant was advised of his <u>Miranda</u> rights.  (Tr. 21).  Agent Szabo testified that Defendant appeared to understand his <u>Miranda</u> rights and did not indicate that he did not understand.  (Tr. 22).  Agent Szabo then asked Defendant if he was willing to speak to them about the altercation and, though Agent Szabo could not recall if Defendant said "no," he did remember that Defendant was very stoic and nonchalantly shook his head from left to right.  (Tr. 22-23, 28).  In response, Agent Szabo replied "that's fine given the circumstances of the incident that occurred, there's not really a question as to what had happened.  The only thing that I don't know is the why."  (Tr. 23, 29).  In response,

4

Defendant stated "Well, I can tell you that," and made a brief statement similar to the statements made to Officer Smith. (Tr. 23).

Agent Szabo testified that Defendant was selective with his statements and indicated that he did not want to talk about the specifics of the incident or anyone else's role in the incident. (Tr. 24-25). Defendant stated that he remembered Mills "being unconscious and having some blood." (Id.). Defendant then stated that he had nothing more to say and the interview ended, having lasted one or two minutes. (Id.). During the interview, no one touched the Defendant other than to escort him to the office, no one threatened Defendant if he refused to speak, and no promises were made to Defendant if he agreed to make any statements during the interview. (Tr. 24-26). Additionally, no one raised their voices when speaking to Defendant, the interview was very calm, and Defendant was calm, polite, and cooperative. (Tr. 25-26).

## LEGAL ANALYSIS

Defendant made two series of statements regarding the fight that took place in the recreation yard of the SHU on March 1, 2011. Defendant uttered statements to Officer Smith immediately after he was handcuffed and escorted back to his cell. Defendant also made statements to Agent Szabo when they met the next day as a part of the investigation of the assault on Mills. According to Defendant, all of his statements are inadmissible, either because they were allegedly made in the absence of the requisite Miranda warnings, or because Miranda warnings were read to him but disregarded.

1.   **Defendant's Statements to Officer Smith Were Voluntary and Did Not Require Miranda Warnings**

Defendant first contends that statements made to Officer Smith should be suppressed because the statements were made in a custodial situation without the protections of Miranda.  The Government argues in response that Defendant voluntarily provided statements to Officer Smith while being escorted back to his cell, making the statements admissible.  The Court agrees that the statements Defendant made to Officer Smith were voluntary.

Defendant's statements to Officer Smith were unsolicited, spontaneous statements not entitled to Miranda warnings.   The Fifth Amendment of the United States Constitution prohibits the use of an involuntary confession against a defendant in a federal criminal trial.  U.S. Const. amend. V; Dickerson v. United States, 530 U.S. 428, 433 (2000).  In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court recognized the need to further safeguard the privilege against self-incrimination by requiring that Miranda warnings, or other fully effective means, be given to subjects of custodial interrogations.  Miranda, 384 U.S. at 478-79; see also Dickerson, 530 U.S. at 442-43 (rejecting Congress's attempt through 18 U.S.C. § 3501 to reinstate the totality test as sufficient).  The "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."  Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980).  The "functional equivalent" of express questioning occurs when officers use "any words or actions . . . (other than those normally attendant

to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301.  By contrast, "'[v]oluntary and spontaneous comments by an accused . . . are admissible evidence if the comments were not made in response to government questioning.'"  United States v. Sanders, 315 F. App'x 819, 823 (11th Cir. 2009) (quoting Cannady v. Dugger, 931 F.2d 752, 754 (11th Cir. 1991)); see also Miranda, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment . . . .").

The evidence presented shows that Defendant's statements were made voluntarily without any prompting from any officer.  Officer Smith provided credible testimony that even though Defendant did not say much, Defendant spontaneously told Officer Smith that his intentions were to "fight or beat up the guy [Mills]." (Tr. 10-11, 13).  Defendant continued his unprovoked comments when he stated to Officer Smith that "Mills was talking trash and being disrespectful."  (Tr. 13).  After Officer Smith handcuffed Defendant, neither Officer Smith nor any other correctional officer asked Defendant any questions to prompt his statements, spoke to Defendant, or asked any questions in response to Defendant's statements.  (Tr. 8-9).  Additionally, Officer Smith did not threaten Defendant or physically touch Defendant, except to place him in cuffs and escort him back to his cell.  (Tr. 7).

Taking these circumstances into account, the Court concludes that the statements Defendant uttered to Officer Smith, without any prompting from any officer, were spontaneous and not the result of interrogation or the functional equivalent of

interrogation.  Consequently, these statements are admissible, even absent any Miranda warnings.  See United States v. Jules, 244 F. App'x 964, 972 (11th Cir. 2007) (providing that "the absence of Miranda warnings would not preclude the admission of a spontaneous statement"); Cannady, 931 F.2d at 754 ("Voluntary and spontaneous comments by an accused, even after Miranda rights are asserted, are admissible evidence if the comments were not made in response to government questioning"); United States v. Glen-Archila, 677 F.2d 809, 814-15 (11th Cir. 1982) (upholding district court's finding that spontaneous, volunteered statements were admissible despite absence of Miranda warnings); United States v. Savell, 546 F.2d 43, 45-46 (5th Cir. 1977)[1] (concluding that Miranda does not apply "where the statements were unsolicited, spontaneous and freely made prior to any attempted interrogation").  Accordingly, the undersigned **RECOMMENDS** that Defendant's request to suppress his statements to Officer Smith be **DENIED**.

2.     **The Court Cannot Conclude that Defendant's Right to Remain Silent was Scrupulously Honored**

Defendant also argues the statements he made to Agent Szabo should be suppressed because they were given subsequent to Defendant's assertion of his Miranda rights, and Agent Szabo failed to "scrupulously honor" Defendant's assertion of his rights.  The Government argues in response that despite the fact that Defendant invoked

---

[1] In Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent, all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

his right to remain silent, Defendant subsequently and voluntarily abandoned this right without any interrogation.

As previously stated, the "Miranda safeguards come into play whenever a person in custody[2] is subjected to either express questioning or its functional equivalent." Innis, 446 U.S. at 300-01; United States v. Acosta, 363 F.3d 1141, 1148 (11th Cir. 2004); see also United States v. Grimes, 142 F.3d 1342, 1348-49 (11th Cir. 1998) (applying Miranda only if defendant was both (a) in custody and (b) being interrogated at the time the statements were made). The "functional equivalent" of express questioning occurs when officers use "any words or actions . . . (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301.

Additionally, if a defendant indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. Miranda, 384 U.S. at 473-74 (explaining that "[w]ithout the right to cut off questioning, the setting of an in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked"); Gore v. Sec'y for Dep't of Corr., 492 F.3d 1273, 1296 (11th Cir. 2007) ("Under Miranda, therefore, all questioning must be immediately discontinued once a suspect indicates a desire to remain silent."). The suspect does not have to "speak with the discrimination of an

---

[2] The Government does not dispute that Defendant was in custody when he made statements to Agent Szabo.

Oxford don" or use specific words to invoke his right to silence; he simply "must articulate his desire to end questioning with sufficient clarity so that a reasonable police officer would understand that statement to be an assertion of the right to remain silent." Davis v. United States, 512 U.S. 452, 459 (1994); United States v. Racca, 255 F. App'x 367, 370 (11th Cir. 2007); United States v. Mikell, 102 F.3d 470, 476 (11th Cir. 1996) In this case, the Government does not dispute that Defendant invoked his right to silence.  Agent Szabo testified that after he read Defendant his rights and asked Defendant whether Defendant was willing to speak with him, Defendant not only shook his head from left to right, but also might have responded by saying "no."  (Tr. 23, 28). A reasonable law enforcement officer would understand that Defendant's shaking his head no in response to the question of whether Defendant was willing to speak with Agent Szabo to be an assertion of the right to remain silent.

When the defendant makes statements after invoking the right to remain silent, statements made, in some cases, may be admissible if the law enforcement interrogator has scrupulously honored the defendant's right to cut off questioning.  United States v. Muhammad, 196 F. App'x 882, 885 (11th Cir. 2006).  The question of whether a defendant's right to cut off questioning was scrupulously honored is evaluated on a case by case basis.  Jackson v. Dugger, 837 F.2d 1469, 1472 (11th Cir. 2006).  The scrupulously honored standard, at a minimum, requires the government to refrain from questioning a suspect unless the suspect both (1) initiates further conversation; and (2) waives the previously asserted right to silence.  Muhammad, 196 F. App'x at 885;

10

Jacobs v. Singletary, 952 F.2d 1282, 1293 (11th Cir. 1992). Impermissible interrogation includes both express questioning and words or actions by the police that the police should know are reasonably likely to elicit an incriminating response from the suspect. United States v. Ramsey, 992 F.2d 301, 305 (11th Cir. 1993); Christopher v. State of Fla., 824 F.2d 836, 846 (11th Cir. 1987). In Christopher v. State of Fla., 824 F.2d 836 (11th Cir. 1987), the Eleventh Circuit has further expounded that after the defendant's invocation of the right to silence, "[a]lthough the police may terminate an interrogation without falling into total silence, *any discussion with the suspect other than that 'relating to routine incidents of the custodial relationship'* must be considered a continuation of the interrogation." Christopher, 824 F.2d at 845 (emphasis added). As explained by the Eleventh Circuit:

> Specifically, the police may make routine inquiries of a suspect after he requests that they terminate questioning such as whether he would like a drink of water. They may not ask questions *or make statements* which open up a more generalized discussion relating directly or indirectly to the investigation," as this constitutes interrogation.

Christopher, 824 F.2d at 845, citing United States v. Johnson, 812 F.2d 1329, 1331 (11th Cir. 1986); see also United States v. Thomas, 521 F. App'x 878, 882 (11th Cir. 2013) ("This Court has stressed that once an accused requests counsel, the officer cannot ask questions, discuss the case, or present the accused with possible sentences or benefits of cooperation."). In Christopher, after the defendant cut off questioning by stating that he had "nothing else to say," the police officer conducting the interrogation continued to make statements to and ask questions of the defendant relating to the

11

subject matter of the investigation, such as the statement, "You were accused when you came in here. You knew what you were accused of, and I told you what your daughter was accused of, so don't make out like you don't know what you are accused of." Id. at 842. Additionally, after the defendant invoked his right to silence again, the officer changed the subject to whether defendant wanted to waive his right to extradition proceedings. Id. at 843. The officer explained that if defendant did not waive extradition, it may take thirty to sixty days before defendant was extradited to another state. Id. at 843-44. During the discussion, the defendant asked what would happen to his daughter and after answering the defendant's question, the officers changed the subject back to the defendant's involvement in the murders. Id. at 843-44. The Eleventh Circuit concluded that the officers' subsequent statements and questions represented a continuation of the interrogation and therefore the defendant's subsequent statements were inadmissible. The Eleventh Circuit further concluded that the officer's inquiries regarding the defendant's extradition also related directly or indirectly to the investigation and were therefore an unlawful continuation of the interrogation. Id. at 844.

Similarly, in United States v. Pena, 897 F.2d 1075, 1081-82 (11th Cir. 1990), abrogated on other grounds by Davis v. United States, 512 U.S. 452 (1994), the special agent read the defendant his Miranda rights and asked the defendant if he wished to cooperate. The defendant stated, "I want to. I really want to but, I can't. They will kill my parents." Id. at 1081-82. In response the agent informed the defendant that

12

marijuana had been recovered and the defendant replied, "I've made a big mistake." Id. The Eleventh Circuit concluded that the defendant's statements were "if not a clear invocation," "at the very least an uncertain invocation of the fifth amendment right to remain silent." Id. The Eleventh Circuit further concluded that the special agent's comment elicited the defendant's "exclamations of regret" and that the defendant's assertion of the right to remain silent was not scrupulously honored. Id. The Eleventh Circuit further noted that "[t]his practice of permitting interrogators to apprise a suspect of the evidence against him as a prelude to asking him to reconsider his decision to remain silent has been brought into doubt by Rhode Island v. Innis, 446 U.S. 291, 301 . . . (1980)." Id. at 1082 & n. 16.

Based on the aforementioned Eleventh Circuit precedents, this Court cannot conclude that Agent Szabo scrupulously honored Defendant's right to remain silent. First, Agent Szabo's continuation of the discussion about the investigation after Defendant invoked his right to remain silent constituted interrogation within the meaning of Miranda. As explained in Christopher, supra, "[a]lthough the police may terminate an interrogation without falling into total silence, *any discussion with the suspect other than that 'relating to routine incidents of the custodial relationship'* must be considered a continuation of the interrogation." Christopher, 824 F.2d at 845 (emphasis added). In this case, the Defendant unambiguously cut off questioning by shaking his head in response to Agent Szabo's question as to whether he was willing to speak to them, however, Agent Szabo did not immediately cease discussion about the

13

investigation.  Instead, Agent Szabo immediately continued the discussion about the subject of the interrogation, when he replied "that's fine given the circumstances of the incident that occurred, there's not really a question as to what had happened.  The only thing that I don't know is the why." (Tr. 23, 29).  Agent Szabo's comment in this regard was interrogation as defined in <u>Christopher</u>, even though it technically might not be a question, because it related to the subject of the interrogation.

Additionally, Agent Szabo's actions in this case are factually indistinguishable from the officers' actions in <u>Pena</u> deemed a violation of the defendant's <u>Miranda</u> rights whereby the officers advised the defendant there that marijuana had been recovered after his invocation of the right to silence, and as a result, elicited the defendant's statement that he made a big mistake.  <u>Pena</u>, 897 F.2d at 1081-82.  Just as in <u>Pena</u>, the Defendant here was presented with evidence of his guilt in that Agent Szabo told him "there's really not a question as to what happened," and Defendant responded with inculpatory statements.  Under these circumstances, based on the Eleventh Circuit case law, this Court cannot conclude that Defendant's invocation of the right to silence was scrupulously honored.  <u>See</u> <u>Christopher</u>, 824 F.2d at 842-46; <u>see also</u> <u>Ramsey</u>, 992 F.2d at 305-06 (reasoning that statements made subsequent to invocation of right to remain silent were inadmissible because the agents impermissibly interrogated the defendant when they attempted to persuade him to make a statement by explaining the length of a potential sentence and that he might benefit from cooperation within twenty to thirty minutes after his invocation of the right to silence), <u>abrogated on other grounds by</u> <u>Davis</u>

14

v. United States, 512 U.S. 452 (1994); United States v. Gomez, 927 F.2d 1530, 1536 (11th Cir. 1991) (statements made by officers regarding benefits of cooperation and the possible severity of sentence made after invocation of right to counsel were impermissible interrogation); United States v. Johnson, 812 F.2d 1329, 1331 (11th Cir. 1986) (explaining that when FBI agent asked defendant whether he wanted to know what would happen to him after defendant invoked his right to counsel, defendant's statements that followed were inadmissible because such statements are often designed to inform the accused that cooperation may be beneficial and explaining that "[i]t best serves all interests, especially law enforcement, to remain close to the 'bright line'" and that interrogation must cease when an accused in custody requests the presence of a lawyer before further interrogation); United States v. Williams, No. 12-60116-CR-RNS, 2012 WL 4449439, at *1 (S.D. Fla. Sept. 26, 2012) (concluding that where detective told defendant "before we really talk to you, we have to explain your rights to you and everything," defendant responded, "I don't even wanna talk," and detective inquired, "You don't want to know what's goin' on," defendant's subsequent statements were inadmissible because defendant made an unambiguous assertion of his right to silence and further comment by the detective did not scrupulously honor that right).

This Court also cannot conclude that Defendant's responsive statements constituted a re-initiation of further conversation by Defendant because the interrogation had not ended. A suspect re-initiates the questioning if he evinces a willingness and a desire for generalized discussion about the investigation. Muhammad, 196 F. App'x at

15

886, citing Jacobs, 952 F.2d at 1294. For it to be re-initiation, however, the suspect has to have reopened the dialogue, not the law enforcement agents. Christoper, 824 F.2d at 845. Additionally, re-initiation requires that previous police initiated interrogation have ended prior to the suspect's alleged initiatory remark. See, e.g., Jacobs, 952 F.2d at 1293 (noting that in cases where the Government successfully argued the defendant re-initiated the interrogation after invoking his rights, at a minimum, one or more hours separated a suspect's invocation of rights and the subsequent interrogation and where only one or two hours separated the initial interrogation and the subsequent one, the police observed other procedural safeguards of Miranda such as ceasing their questioning of the subject or leaving him alone after he indicated that he did not want to make a statement); Christopher, 824 F.2d at 845. This case does not involve a situation where the conversation was re-initiated by the Defendant without any prompting from the law enforcement agents, because the discussion in connection with the investigation never ended.

Cases cited for the Government for the proposition that the comment by Agent Szabo was "subtle compulsion," and not coercion that runs afoul of Miranda are distinguishable. First, in Rhode Island v. Innis, 446 U.S. 291 (1980), an officer arrested the defendant, advised him of his Miranda rights, and waited for other officers to arrive. Id. at 294. After a Sergeant and a captain both arrived on the scene of the arrest and separately gave the defendant his Miranda warnings, the defendant responded that he understood his rights and wanted to speak with a lawyer. Id. The Captain then directed

16

that the defendant be placed in a police car that had a wire screen mesh between the front and rear seats, be driven to the central police station, and instructed the officers not to question the defendant in any way.  Id.  Three officers entered the vehicle with defendant.  While en route, one officer initiated a conversation with another about a missing sawed-off shotgun used in commission of a robbery for which defendant was suspected.  Id. at 293-94.  The officer told another officer in the defendant's presence that a school for the handicapped children was located nearby and that "god forbid one of [handicapped children] might find a weapon with shells and they might hurt themselves."  Id. at 294-95.  The officer also stated that it would be too bad if a little girl "would pick up the gun, maybe kill herself."  Id. at 295.  The Supreme Court reasoned that the officers' discussion was not interrogation as contemplated by Miranda because not only were no questions posed to the defendant, but also the conversation was "nothing more than a dialogue between the two officers to which no response from the respondent was invited."  Id. at 302.  Moreover, the Supreme Court concluded that it could not be said that the officers should have known that their conversation was likely to elicit an incriminating response from the respondent because there was nothing in the record to suggest that the respondent was susceptible to an appeal to his conscience.  Id. at 302-03.  In contrast to the facts of this case, Agent Szabo directed his comment directly to Defendant immediately after Defendant invoked his right to silence.  Additionally, the comment was directed at the subject of the interrogation and discussed the knowledge gained in the investigation.

17

Furthermore, United States v. Muhammad, 196 F. App'x 882 (11th Cir. 2006) is also distinguishable. In that case, a postal inspector advised the defendant, Muhammad, of his Miranda rights after taking him into custody and Muhammad responded that he understood his rights. Id. at 884. During a subsequent interrogation at the Postal Inspector's office, Muhammad was questioned by Inspector Willis and became very agitated when he was accused of robbing the post office. Id. A colleague interrupted the interrogation and advised Willis that a handgun found at Muhammad's home had been stolen. Id. Willis then asked Muhammad about the gun and Muhammad expressed increased anger at the questions and told Willis that he did not want to talk to Willis anymore. Id. Willis ceased the interrogation. Id. Willis then began asking Muhammad for his personal biographical information in order to complete paperwork. Id. At that point, Muhammad made additional voluntary statements pertaining to the investigation. Id. Willis then asked Muhammad, "Do you want to talk about this or not? Because you don't have to." Id. at 884. Muhammad unequivocally stated that he wanted to continue the discussion and made inconsistent and inculpatory statements. Id. In Muhammad, the Eleventh Circuit concluded that while Muhammad's statement that he did not want to talk to Willis anymore was a clear invocation of his right to remain silent, the routine, biographical questions Willis asked did not constitute a commencement of formal interrogation, since an officer's request for routine information for booking processes is not considered an interrogation under Miranda. Id. at 886. In addition, Willis' query to Mohammad about whether he wanted to continue the discussion was not interrogation

18

because it was merely an attempt to clarify conflicting signals Muhammad was sending to Willis about invoking his right to remain silent while continuing to talk about the robbery. Id. at 886. In contrast, the statement made by Agent Szabo was not in the nature of routine booking questions or an attempt to clarify an ambiguous assertion of the right to remain silent.

Finally, the remaining persuasive authority cited by the Government from the Fourth Circuit does not control this case. For instance, in United States v. Payne, 954 F.2d 199 (4th Cir. 1992), a defendant, after expressing his desire to consult with counsel, made incriminating comments to a federal agent in response to the agent's declaratory comment that a gun was found in the defendant's house. Id. at 200-01. That court concluded that "mere declaratory descriptions of incriminating evidence do not invariably constitute interrogation for Miranda purposes." Id. at 202. The Court further noted that it may even be in the interest of a defendant to be kept informed about matters relating to the charges against him because it might contribute to the intelligent exercise of his judgment regarding what course of conduct to follow. Id. at 202.

This Court concludes that the Eleventh Circuit has a difference of opinion with the Fourth Circuit on this topic. It appears that in the Eleventh Circuit, the fact that the Government may be presenting more information that may be helpful to the suspect's decisionmaking process does not exclude the information from potentially being considered interrogation. The Eleventh Circuit has not hesitated to find that informational comments made by law enforcement officers subsequent to the

19

defendant's invocation of the right to silence were interrogation.  First, in <u>Pena</u>, *supra,* it was deemed a violation of the defendant's <u>Miranda</u> rights when law enforcement advised the defendant there that marijuana had been recovered after his invocation of the right to silence, and as a result, elicited the defendant's statement that he made a big mistake.  <u>Pena</u>, 897 F.2d at 1081-82.  Similarly, in <u>United States v. Ramsey</u>, 992 F.2d 301 (11th Cir. 1993), the agents' discussion of information about the length of a potential sentence and the possible benefits of cooperation provided within twenty to thirty minutes after the defendant's invocation of the right to silence was considered impermissible interrogation.  <u>Id.</u> at 305-06 (also noting that once <u>Miranda</u> warnings have been given, if the individual indicates in any manner at any time prior to questioning that he wishes to remain silent, the interrogation must cease and any statement taken after the person invokes the privilege cannot be other than the product of compulsion, subtle or otherwise.") (citing <u>Miranda</u>, 384 U.S. at 473-74).  Therefore, this Court concludes that the Eleventh Circuit would evaluate the situation discussed in <u>Payne</u> differently than the Fourth Circuit.  Because Agent Szabo did not scrupulously honor Defendant's right to remain silent, Defendant's motion to suppress statements made by Defendant to Agent Szabo should be **GRANTED**.

## CONCLUSION

Based on the aforementioned reasons, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Statements be **GRANTED IN PART AND DENIED IN PART**.  Docket Entry [23].

AO 72A
(Rev.8/82)

**SO ORDERED, REPORTED AND RECOMMENDED** this <u>25th</u> day of October, 2013.

<u>/s/ Linda T. Walker</u>
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

21